# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

RANDALL S. JARRED,          )
                                     )
      Plaintiff,            )
                                     )
    vs.                      )       Case number 4:08cv1382 DJS
                                     )                               TCM
MICHAEL J. ASTRUE,          )
Commissioner of Social Security,    )
                                     )
      Defendant.         )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying Randall S. Jarred ("Plaintiff") disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433. Plaintiff has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer. The case was referred to the undersigned United States Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

## Procedural History

Plaintiff applied for DIB on November 10, 2005, alleging he was disabled as of October 20, 2005, as a result of back problems, including cramps and muscle spasms; arthritis; an inability to stand on his feet for extended periods of time; and difficulty

handling or grasping objects. (R.[1] at 74-76.) His application was denied initially and after a hearing on February 27, 2007, before Administrative Law Judge ("ALJ") Randolph E. Schum. (Id. at 13-44, 46–50.) The Appeals Council denied his request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-3.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, testified at the administrative hearing. Jeff Magrowski, Ph.D., a vocational expert ("VE"), also testified.

Plaintiff testified that he was then 47 years old.[2] (Id. at 24.) He had graduated from high school. (Id.) From 1979 until October 2005, Plaintiff worked as a machinist for two different companies. (Id. at 24–25.) As part of his jobs, Plaintiff operated manual vertical mills and computer numerical controlled ("CNC") machines. (Id. at 25.) Plaintiff had not worked anywhere since October 20, 2005, and after that date he did not receive vacation pay, unemployment compensation, or a pension. (Id. at 25–26.)

A personal injury lawsuit arising from an August 2004 automobile accident had settled the month before the hearing. (Id. at 26.) Plaintiff received $72,000 after payment of attorney's fees. (Id. at 26–27.)

Plaintiff further testified that approximately 15 years before the hearing he had had three carpal tunnel surgeries within a relatively short period time. (Id. at 27.) Since the

---

[1]References to "R" are to the administrative record filed by the Commissioner.

[2]Plaintiff was born on September 16, 1959. (Id. at 74.)

surgeries, Plaintiff is barely able to bend two of his fingers.  (Id. at 29.)  He had surgery on his left shoulder because of injuries sustained in the automobile accident.  (Id. at 27.)  Since that surgery, Plaintiff has experienced stiffness in his left shoulder.  (Id. at 29.)

Plaintiff has high blood pressure that is controlled by medication.  (Id. at 27-28.)  He also suffers from acid reflux attacks that occur two or three times a day.  (Id. at 28.)  He only takes over-the-counter medication to treat his acid reflux because he can no longer afford the prescription medication.  (Id.)  When he did take that medication, it helped.  (Id.)  Plaintiff has neck problems that prevent him from moving his head to one side without pain.  (Id.)  He  suffers from stabbing back pain that comes and goes and runs from his neck down to his buttocks.  (Id. at 29-30.)  He has started carrying a cane because his left leg sometimes gives out.  (Id. at 30.)  The cane was not prescribed by his physician.  (Id.)  Plaintiff also gets severe headaches once or twice a day that might last as long as fifteen minutes.  (Id.)  He takes prescription medication for the headaches.  (Id.)

He smokes about three cigarettes per day.  (Id. at 28.)

Plaintiff performs a few chores around his house, including washing dishes and light vacuuming.  (Id. at 31.)  Plaintiff does not cut his grass or take out the garbage.  (Id.)  It has been a couple of years since he went fishing.  (Id.)  He is able to drive an automobile, which he does two or three times a week for distances of about ten miles.  (Id. at 32.)  His brother drove him to the hearing.  (Id.)  The longest distance Plaintiff can walk at any given time is approximately two blocks, after which his left leg gives out and he experiences sharp, stabbing back pain.  (Id. at 32–33.)  On an average day, he can sit in

a chair for at most a half-hour.  (Id. at 33.)  When asked about climbing a normal flight of stairs in a two-story house, he explained that he has to stop halfway.  (Id.)  Plaintiff is able to bend over and stoop down, but has difficulty straightening up due to his back locking up and pain in his leg.  (Id.)  Plaintiff is left-handed.  (Id. at 33, 42.)  He has trouble bending his index and middle fingers on his left hand and has very little grip with these fingers.  (Id. at 34.)  Because of this problem, Plaintiff has difficulty buttoning his shirt, lacing up his shoes, or picking up a coffee pot.  (Id.)  The heaviest weight he can pick up and carry from one room to the next is five to ten pounds.  (Id. at 35.)  An attempt to carry any more weight causes back pain.  (Id.)

Plaintiff and his wife attend very few social activities with friends or family because of the difficulty he has in getting out.  (Id.)

Plaintiff does not have any health insurance, and pays for his visits to Dr. Geekie and Dr. Myers with a credit card.  (Id.)  Plaintiff exercises by stretching.  (Id.)

On a typical day, Plaintiff gets out of bed at about 5 a.m.  (Id. at 36.)  He then brushes his teeth, drinks coffee, and reads the paper.  (Id.)  The rest of the morning he lays on the sofa, watching television and reading.  (Id.)  In the afternoon, Plaintiff helps his wife with some household chores to the extent that he can.  (Id.)  He does light vacuuming and washes dishes, but cannot do these activities for more than five to ten minutes at a time.  (Id.)  Plaintiff takes a nap every afternoon for one to two hours.  (Id. at 37.)  His wife does the grocery shopping.  (Id. at 36.)  Plaintiff goes to bed at about 9:30 at night.  (Id.)  With medication, Plaintiff is able to sleep well.  (Id. at 37.)

On a typical day at home when there are no special events or activities, Plaintiff rates his pain as a six or seven out of ten when he is using his medication. (Id.) After coming back from a doctor appointment, Plaintiff rates his pain as an eight or nine out of ten. (Id. at 38.) As a side effect of his medication, Plaintiff feels very sleepy all the time. (Id.)

Upon questioning by the VE, Plaintiff testified that he operated a CNC machine before being unable to work. (Id.) Plaintiff did not program the machine, but operated it from a panel board. (Id.)

The ALJ then questioned the VE. (Id.) The ALJ posed the following hypothetical: assume a 46-year-old claimant with a high school education who can lift twenty pounds occasionally and ten pounds frequently; requires a sit/stand option to work; can occasionally climb stairs and ramps, but not ropes, ladders or scaffolds; can stoop occasionally; whose fingering and fine manipulation is limited to repetitive work with very small objects; and who should avoid concentrated exposure to unprotected heights and vibrations. (Id. at 38–39.) Asked whether this hypothetical claimant could return to Plaintiff's past relevant work, the VE said, "No, I don't think so." (Id. at 39.) After clarifying that this hypothetical claimant can still write, the VE replied that the claimant would be able to secure employment in semi-skilled, light work. (Id. at 39–40.) Examples of this type of work include furniture rental consultant and a gate or watch guard. (Id.)

The ALJ posed a second hypothetical with the same characteristics except for two changes: the claimant can lift ten pounds occasionally and less than ten pounds frequently, and the claimant can sit for six hours out of eight and can stand or walk for two hours out of eight. (Id. at 40.) When asked whether this claimant could return to Plaintiff's past relevant work, the VE again replied that the claimant could not. (Id.) The VE did give two examples of some jobs that such a claimant could secure, including food and beverage order clerk and surveillance system monitor. (Id. 40–41.)

Plaintiff's attorney also questioned the VE, asking whether the hypothetical claimant would be able to perform these other jobs if the claimant had impairments of his dominant hand that allowed for very little, if any, handwriting or keyboarding on a computer. (Id. at 41.) The VE replied that his previous answer had assumed that the claimant could perform those tasks on an occasional level. (Id. at 41–42.) If those tasks could not be performed occasionally, then the claimant could not perform any jobs. (Id. at 42.) The attorney then asked what the consequences would be if the claimant takes pain medication that causes significant side effects of sleepiness and has significant adverse effects on attention and concentration. (Id.) The VE did not know of any jobs that the claimant could do under those conditions. (Id.)

**Medical and Other Records Before the ALJ**

The documentary record before the ALJ included forms completed on behalf of Plaintiff as part of the application process, documents generated pursuant to that process, records of health care providers, and various evaluation reports.

Plaintiff reported on a November 2005 Disability Report form that he was five feet four inches tall and weighed 185 pounds.  (Id. at 87, 100.)  His impairments of back problems and arthritis first started bothering him ten years before and prevented him from working as of October 20, 2005, because they prevented him from standing on his feet for very long, made his hands go numb, caused him difficulty grasping or handling, made his back cramp if he turned, and caused muscle spasms and stabbing pain.  (Id. at 88.)  His various doctors prescribed Advicor (for high cholesterol), amitriptyline (an anti-depressant), enalapril (for hypertension), gabapentin (for pain), hydrocodone (for pain), isometh apap/dichlor (for headaches), naproxen (for arthritis), Prevacid (for acid reflux), and Tricor (for high cholesterol).  (Id. at 94.)  None caused any side effects.  (Id.)

In a Disability Report – Appeal form, Plaintiff listed eight prescribed medications: Advicor, amitriptyline, enalapril, gabapentin, nabumetone (for arthritis), naproxen, and Prevacid.  (Id. at 103.)  As before, none caused any side effects.  (Id.)  During an interview, Plaintiff appeared restless and "in a lot of pain."  (Id. at 109.)  He shifted positions in his chair several times and occasionally had to stand up.  (Id.)  He had difficulty remembering medical sources and dates.  (Id.)  When signing documents, he had to pause and shake his hands out.  (Id.)

Also as part of the application process, Plaintiff completed a Function Report.  (Id. at 113-20.)  His description of his daily activities was consistent with his hearing testimony.  (See id. at 113, 115-16.)  Before his impairments, he was able to "live a full life; work around house; lift objects[;] sit/stand for longer periods of time."  (Id. at 114.)

His impairments create difficulties in dressing due to the problems he has reaching above his head.  (Id.)  His back pain and numbness have also affected his abilities to lift, squat, bend, stand, walk, sit, kneel, complete tasks, climb stairs, and use his hands.  (Id. at 118.)

Plaintiff's earnings record reflects steady employment from the second quarter of 1977 to the fourth quarter of 2005.  (Id. at 83-84.)

The earliest medical record before the ALJ was from nerve studies done of Plaintiff in March 2002.  (Id. at 193,[3] 199-200.)  Ashok Kumbar, M.D., found "no electrodiagnostic evidence of a left cervical radiculopathy" and no changes of denervation in Plaintiff's left upper extremity muscles.  (Id. at 193.)  He did find electrodiagnostic evidence of "a left median sensory fixal neuropathy at [Plaintiff's] wrist" and noted that Plaintiff had a history of two left carpal tunnel releases.  (Id.)  The left ulnar and superficial radial nerve conductions were normal.  (Id.)  The needle electromyogram ("EMG") studies of Plaintiff's left cervical paraspinal and selected muscles of his left upper extremity were normal.  (Id.)  X-rays taken of Plaintiff's lumbar spine eight months later showed small anterior marginal spurs, but no evidence of any recent fractures or destructive bone diseases.  (Id. at 198.)

The next medical record is dated almost two years later when, on August 20, 2004, Plaintiff consulted a neurologist, Gary H. Myers, M.D., about pain that began in his left scapula region and radiated to his neck, causing headaches, with associated blurred

_____

[3]Page 193 is the third page of the report that begins at pages 199 and 200.

vision, and pain in his teeth.  (Id. at 157-59.)  The pain also radiated down his leg to his

left foot.  (Id. at 157.)  The pain began approximately 25 years earlier.  (Id.)  The past

treatment of nerve blocks and trigger point injections no longer helped.  (Id.)  He had

taken Vicodin (for pain), but it caused sleepiness.  (Id.)  His social history included

smoking one to one and one-half packs of cigarettes a day and occasional use of alcohol.

(Id. at 158.)  On examination, Plaintiff was alert; oriented to time, person, and place;

cooperative; and in no acute distress.  (Id.)  There was no aphasia (impaired speech

communication) or dysarthria (disturbed speech).  (Id.)  His memory and general

knowledge were good.  (Id.)  His pupils were equal and reactive to light; his corneal

reflexes were present bilaterally with normal facial sensation to pin and touch.  (Id.)  He

could swallow and shrug his shoulders without difficulty.  (Id.)  He had good strength,

normal muscle tone, no weakness, and no atrophy in all four extremities.  (Id.)  Sensory

testing was intact.  (Id.)  There was pain on palpation to the left scapula.  (Id.)  Dr. Myers'

impression was of musculoskeletal pain.  (Id.)  He recommended that Plaintiff continue

on his current medication, call his office with the current dosage of such, and return in

four to six months.  (Id. at 159.)

Ten days later, Plaintiff was treated at the St. Louis University Hospital emergency

room following a motor vehicle accident.  (Id. at 132-46.)  His chief complaint was

headaches, which were relieved by morphine.  (Id. at 134, 136, 138.)  His preexisting

conditions included gastroesophageal reflux disease ("GERD"), back pain, and high blood

pressure.  (Id. at 134, 139.)  He had an abrasion on his head.  (Id. at 136.)  A computed

tomography ("CT") scan of his head showed no abnormality.  (Id. at 141.)  A CT scan of his abdomen and pelvis showed no acute injury, fracture, or dislocation.  (Id. at 142-43.) An x-ray of his chest showed no acute disease.  (Id. at 144.)  An x-ray of his cervical spine showed no fracture or subluxation.  (Id. at 145.)  Plaintiff was discharged home the same day with instructions to follow up with his primary care physician, take his medications as prescribed, and return to the emergency room if his symptoms worsen. (Id. at 138, 140.)

A magnetic resonance imaging ("MRI") of Plaintiff's left shoulder on September 2 revealed "tendonopathy of the anterior supraspinatus and the superior subscapularis tendons, with a small full thickness tear at the junction of these tendons.  Effusions in both the glenohumeral and subdeltoid bursal spaces."  (Id. at 188.)

Plaintiff saw Robert C. Geekie, M.D.,[4] on December 30, for his back pain.  (Id. at 163.)  He reported that he had seen Dr. Myers for pain management.  (Id.)  He had been in an accident three months earlier, which had caused a bone spur in his left shoulder and increased back pain.  (Id.)  He wanted to see Paul Young.  (Id.)  Five days later, on January 4, 2005, Plaintiff had an MRI of his dorsal spine.  (Id. at 185.)  Other than showing mid-dorsal spondylosis, the MRI showed satisfactory alignment and was negative.  (Id.)  An MRI done the same day of his cervical spine, showed early changes

---

[4]Although Dr. Myers' August 2004 letter is addressed to Dr. Geekie and the report of the September 2, 2004, MRI lists Dr. Geekie as the referring physician, the earliest record of Dr. Geekie is of the December visit.

of spondylosis at C5-C6 and, especially, C6-C7.  (<u>Id.</u> at 187.)  The other cervical levels were normal.  (<u>Id.</u>)

On January 24, Plaintiff consulted Paul H. Young, M.D., about pain in his cervical spine, reporting that it had begun six months earlier.  (<u>Id.</u> at 151-52.)  His social history included "[m]inimal alcohol consumption" and smoking one pack of cigarettes a day.  (<u>Id.</u> at 151.)  He described the onset of the pain as spontaneous following an accident in which his car was struck from behind.  (<u>Id.</u>)  The pain was "achy, deep, sharp, shooting, throbbing, tight," and moderate in severity.  (<u>Id.</u>)  It did not radiate.  (<u>Id.</u>)  Associated symptoms included headaches.  (<u>Id.</u>)  On examination, Plaintiff was moderately restricted in the movement of his head and neck.  (<u>Id.</u>)  He had no instability or subluxation in either shoulder.  (<u>Id.</u> at 152.)  He had no joint instability in the digits of either hand.  (<u>Id.</u>)  His muscle strength in both the right and left upper extremities was 5/5.  (<u>Id.</u>)  His deep tendon reflexes were normal and symmetrical.  (<u>Id.</u>)  A magnetic resonance imaging ("MRI") of his cervical and thoracic spines showed no disc herniation.  (<u>Id.</u>)  The treatment plan included biofeedback; functional reconditioning; a home exercise program for his upper body, shoulders, and neck; massage therapy; muscle stimulation; and a progressive strengthening and stretching program.  (<u>Id.</u>)  Plaintiff was given a prescription for Skelaxin, a muscle relaxant.  (<u>Id.</u>)  Dr. Young recommended a trigger point injection for his left cervical paraspinal.  (<u>Id.</u>)

Also, Dr. Young referred Plaintiff to SpineCare, Inc., for physical therapy.  (<u>Id.</u> at 173-75.)  Plaintiff was seen there the next day for an initial evaluation.  (<u>Id.</u>)  He reported

that he had upper back pain, headaches, a stiff neck, and left leg pain, which had existed for years but had been aggravated by a car accident a few months earlier. (Id. at 173.) Therapy, chiropractic care, and pain management had not helped. (Id.) Currently, his pain was an eight on a ten-point scale. (Id.) The pain in his mid-back and left leg was constant; it was alleviated only by alcohol and Vicodin. (Id.) He had severe difficulties sleeping at night. (Id.) His work as a machinist required constant standing and bending over, which placed a lot of strain on his back. (Id.) He had recently had left rotator cuff surgery and, in the past several months, had had three carpal tunnel surgeries. (Id.) He was currently taking pain medication and muscle relaxers. (Id.) On examination, his posture when standing was "significant for left shoulder depression and left shoulder blade abduction." (Id.) His active range of motion in his lower extremities, upper extremities, and lumbar area was within normal limits and pain free. (Id. at 173-74.) He had a diminished reflex at L3-L4 and increased dizziness and headache when flexing his cervical spine. (Id. at 174.) The therapist described Plaintiff's "rehab potential" as "good," as was his understanding of the role of physical therapy and its goals. (Id. at 175.) Consistent with Dr. Young's orders, Plaintiff was to be seen two to three times a week for four to six weeks. (Id.)

Plaintiff was seen for twenty visits until March 29. (Id. at 166-72.) After the first therapy session, Plaintiff reported that his left leg felt better. (Id. at 172.) Plaintiff reported on February 9 that his symptoms were getting better but were still present. (Id. at 171.) He had a lot of left shoulder pain. (Id.) Two days later, he was feeling "really

good," had no leg pain, and had less left shoulder pain. (<u>Id.</u>) This improvement was still present on February 14. (<u>Id.</u>) On February 22, Plaintiff reported that he had been feeling so good the previous week that he had stopped taking his medications. (<u>Id.</u> at 170.) By Monday, his pain had become so bad he had to leave work. (<u>Id.</u>) Two days later, Plaintiff's leg pain was gone but his neck pain was only slightly improved. (<u>Id.</u> at 169.) He reported on March 1 that three trigger point injections he had received the day before had "helped a great deal." (<u>Id.</u>) He was able to move his neck completely to the left without pain. (<u>Id.</u>) Plaintiff had no pain when seen on March 4; his flexibility was improving. (<u>Id.</u> at 168.) Four days later, some pain had returned. (<u>Id.</u>) On March 21, he reported that he was feeling great. (<u>Id.</u> at 167.) He hoped the feeling would last. (<u>Id.</u>) Two days later, however, he reported that he had immediate pain when bending down at work that day and that his left leg still constantly cramped. (<u>Id.</u>) On March 28, returning to therapy after a weekend, he described his pain as a two on a ten-point scale. (<u>Id.</u>) At the end of the prescribed sessions, he reported that he wanted to see how he felt and then might return. (<u>Id.</u> at 166.) The therapist suggested a workout program; Plaintiff said he would think about it. (<u>Id.</u>)

During this period when he was participating in physical therapy, Plaintiff called Dr. Geekie's office on February 22 to arrange an appointment for trigger point injections. (<u>Id.</u> at 162.) He was told to schedule an appointment at the pain management center. (<u>Id.</u>)

Six days later, Plaintiff was again seen by Dr. Myers for a neurological consultation. (Id. at 154-56.) Plaintiff reported that he continued to have left shoulder pain following his August 2004 accident and the subsequent rotator cuff surgery. (Id. at 154.) He could move his arm better. (Id.) He had, however, more pain in his neck and a decreased range of motion. (Id.) He also had pain in his back by the left scapula. (Id.) Dr. Myers noted that the x-ray of cervical spine taken the month before showed a C6-C7 bulging disc but "no true herniated disc." (Id.) The thoracic MRI appeared normal. (Id.) He further noted that Plaintiff had begun physical therapy, including heat, ultrasound, exercises, and massage, four weeks earlier. (Id.) At first, the therapy helped; currently, he had increased neck, back, and head pain. (Id.) On examination, Plaintiff was as when examined in August 2004. (Id. at 155.) Additionally, although Plaintiff had negative straight leg testing bilaterally,[5] he had a decreased range of motion in his cervical spine. (Id.) When laterally rotating his neck, he complained of pain on the left side. (Id.) Plaintiff further complained that his back pain increased if he stood for longer than an hour. (Id. at 156.) He was having difficulty performing his work as a machinist. (Id.) Dr. Myers' diagnosis was traumatic thoracic pain. (Id.) He recommended trigger point injections. (Id.)

---

[5]A straight leg raise test is conducted to evaluate a patient for disc herniation. It is performed by the physician raising the leg up of a patient when the patient is lying flat on his back on the examining table. David Della-Giustina and Robert Nolan: Evaluation and Management of Acute Low Back Pain, http://www.emedmag.com/html/pre/cov/covers/071504.asp (last visited Dec. 15, 2009). A positive straight leg raise or pain on such a raise is indicative of spinal problems. See Id.

Plaintiff or his wife then made several telephone calls to Dr. Geekie's office to arrange for the injections. (See id. at 161-62.) Subsequently, Plaintiff had six trigger point injections: one on February 28 to his neck; one on March 17 to his left upper shoulder and neck region; one on May 2 and again on June 27 to his left intrascapular region; one on August 5 to the muscle near the left scapula; and one on October 10 to upper thoracic area. (Id. at 179-94.)

On October 19, Plaintiff consulted an assistant in Dr. Geekie's office about his back, neck, and bilateral hand pain. (Id. at 218.) He explained that he has carpal tunnel syndrome and had had two surgeries on his left hand and one on his right. (Id.) He reported that trigger point injections relieved his pain for three to four weeks. (Id.) He was having difficulty at work, but was too young to retire. (Id.) On examination, he had a good range of motion, but pain, in his neck. (Id.) The back pain was most severe in the left scapular region and radiated down his back to his arms. (Id.) Plaintiff was to schedule an MRI of his cervical spine. (Id.) Plaintiff was given an excuse for work for three days and his prescription for Vicodin was refilled by Dr. Geekie the next day after he reviewed the assistant's notes. (Id.)

On October 21, Plaintiff had the MRI of his cervical spine. (Id. at 177-78, 197.) The exam revealed minimal uncovertebral and facet arthropathy on the left side at C6-C7, resulting in minimal left foraminal narrowing. (Id. at 177, 197.) There was no other foraminal or central canal stenosis at any level. (Id.)

Plaintiff was examined on November 3 by R.V. Shitut, M.D. (Id. at 194-95.) Plaintiff's chief complaints were cervical and lower back pain and bilateral hand numbness and cramping. (Id. at 194.) Plaintiff had had the neck pain for ten years; the pain had gradually begun to increase. (Id.) Currently, the pain was from his neck to his waist. (Id.) He had had the hand pain for at least a year. (Id.) During the past eight months, he had had left lateral thigh and foot pain. (Id.) The lower and middle back problems had been worse the past two months. (Id.) Work was difficult, as was bending and lifting. (Id.) Lying flat gave him some relief. (Id.) On examination, Plaintiff was in moderate distress due to pain all over his body. (Id.) The distress has been acute for the past two and one-half weeks; hence, he was not currently working as a machinist. (Id.) Asked what hurt worse, he replied, "everything." (Id. at 195.) Dr. Shitut described Plaintiff's symptoms as "way too much and not at all focused." (Id.) He had tenderness from behind his eyes down the midline of his cervical spine and into his upper thoracic spine. (Id.) His neck rotation was "a little bit restricted," and his hands, aside from the symptoms, were neurologically normal. (Id.) The sensory, motor, and reflex exam of his upper extremities was normal. (Id.) He stood in a bent-forward position, had moderate difficulty with flexion, and extreme difficulty with extension. (Id.) The sensory, motor, and reflex exam of his lower extremities was normal. (Id.) He had no "obvious" atrophy and was able to walk on his tiptoes and heels without difficulty. (Id.) He had a gross full range of motion without instability in both hips, knees, and ankles. (Id.) Lumbar x-rays were completely normal. (Id.) Dr. Shitut noted that Dr. Geekie's findings of minimal

- 16 -

cervical spondylotic disease at C6-C7 did not explain Plaintiff's symptoms.  (Id.)  He was "unsure as to the cause of [Plaintiff's] multifocal symptoms."  (Id.)  He opined that surgery of any sort would not be helpful for the Plaintiff, but also noting that Plaintiff had never had an MRI of his lumbar spine, scheduled one.  (Id.)

Consequently, on November 8, Plaintiff underwent an MRI exam of his lumbar spine.  (Id. at 192.)  It was noted that he had been symptomatic for ten years.  (Id.)  The exam revealed moderate degenerative disc desiccation and signal loss, with no significant interspace narrowing.  (Id.)  The MRI also showed prominent annulus at L3-L4 and L4-L5 with an annular tear at L4-L5.  (Id.)  There was no finding of a far lateral, foraminal or spinal canal disc protrusion.  (Id.)  There were small renal cyst-like structures in the kidneys; the structures were thought to represent benign retention cysts of one centimeter or less in size.  (Id.)  The radiologist, Edward R. Habert, M.D., described Plaintiff's spinal cord as "developmentally small."  (Id.)  He concluded that there was no evidence of left cervical radiculopathy and no changes in the denervation in the left upper extremity muscles.  (Id.)  He further concluded that there was evidence of a left median sensory focal neuropathy at the wrist, and that Plaintiff had a history of left carpal tunnel release.  (Id.)  The MRI also revealed normal left ulnar and superficial radial nerve conductions.  (Id.)

Two days later, after reviewing the MRI, Dr. Shitut concluded that "surgery had no place in the management of [Plaintiff's] back problems."  (Id. at 196.)  He recommended

the use of physical therapy, exercise programs, and the use of a non-steroidal, anti-inflammatory medication.  (Id.)

On November 29, Plaintiff was again was examined by Dr. Myers.  (Id. at 211-12.) Plaintiff reported having very severe low back pain which resulted in an inability to bend or stoop.  (Id. at 211.)  Before stopping work two months earlier, his coworkers had helped him by doing most of the lifting.  (Id.)  On examination, Plaintiff had decreased mobility in his neck and low back; had low back pain with standing; and, occasionally while sitting or lying down, pain from his left thigh to his foot.  (Id.)  He gave way on motor testing of the lower extremities secondary to lower back pain.  (Id.)  His upper extremity strength was better; his deep tendon reflexes were symmetrical; and his sensory testing was intact for pin and touch.  (Id.)  Dr. Myers suggested that the naproxen be changed to Relafen and that the dosage of Elavil be doubled at bedtime.  (Id. at 212.)

Dr. Myers saw Plaintiff again on March 31, 2006.  (Id. at 210.)  Dr. Myers noted that Plaintiff demonstrated a significantly reduced range of motion of the cervical spine in all directions, most prominent with lateral flexion bilaterally.  (Id.)  Straight leg raising was positive on the left side and negative on the right.[6]  (Id.)  Plaintiff was described as looking "very uncomfortable."  (Id.)  Plaintiff tended to give way on muscle testing due to the low back pain and neck pain.  (Id.)  His deep tendon reflexes were normal.  (Id.)  He

---

[6]See note 5, supra.

had a positive Tinel's sign[7] over the median nerves at both wrists, worse on the left than on the right. (Id.) Dr. Myers further noted that Plaintiff had reported that he did better after his trigger point injections; however, he had to stop the injections because he no longer had insurance and could not pay for them. (Id.) Plaintiff also reported that he had stopped working as a machinist in August 2005 and hoped to receive disability. (Id.)

On April 5, Plaintiff consulted an assistant of Dr. Geekie. (Id. at 217.) It was noted that he had applied for disability and been denied. (Id.) The assistant, Lauren Smith,[8] considered this "somewhat surprising." (Id.) Plaintiff was reported to have pain in his head with movement. (Id.) He was obviously uncomfortable. (Id.) The impressment was of chronic pain and dyslipidemia. (Id.) He was to return for a fasting blood test. (Id.) His next appointment was with Dr. Geekie on April 18.[9] (Id.)

On November 30, Plaintiff was seen by Ms. Smith for an infected spider bite. (Id. at 216.)

Plaintiff saw Dr. Geekie on January 8, 2007, for anxiety and depression. (Id. at 215.) He was trying to get disability; his wife had been diagnosed with lung cancer. (Id.)

---

[7]A "Tinel's sign is performed by lightly banging (percussing) over the nerve to elicit a sensation of tingling or 'pins or needles' in the distribution of the nerve." MedicineNet.com, Definition of Tinel's sign, http://www.medterms.com/script/main/art.asp?articlekey=16687 (last visited Dec. 15, 2009). The Tinel's sign is often positive in a person with carpal tunnel syndrome. Id.

[8]There is nothing in the record to indicate Ms. Smith's position.

[9]There is no record of an April 18 visit.

They had no money. (Id.) He was prescribed Xanax and given a month supply of Lexapro. (Id.) He and his wife were referred to a clinic. (Id.)

On February 19, Dr. Myers saw Plaintiff and reported to Dr. Geekie, in relevant part, as follows.

> [Plaintiff] takes Lexapro 10 mg daily, generic Midrin p.r.n. headache, naproxen 250 mg b.i.d., enalapril 5 mg daily, nabumetone 750 mg b.i.d., gemfibrozil 600 mg b.i.d., gabapentine 300 mg daily, and amitriptyline 50 mg at bedtime. Despite all these medications, [Plaintiff] continues to have significant low back and neck pain. He states that with any prolonged walking, the low back pain radiates down into the left leg. He is beginning to have some pain in the right leg. Lifting and bending cause pain. Prolonged sitting can cause the back pain to increase. He also has neck pain. With rotation and movement of the neck, he gets a frontal headache. He states that his only comfortable position seems to be lying in bed.

(Id.)

The ALJ also had before him the conclusions of a Physical Residual Functional Capacity Assessment ("PRFCA") of Plaintiff completed in March 2006. (Id. at 201-08.) The primary diagnosis was degenerative disc disease; his secondary diagnosis was spondylosis at C5-C6 and C6-C7. (Id. at 201.) Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, and stand, walk, or sit for six hours in an eight-hour workday. (Id. at 202.) He had an unlimited ability to push and pull. (Id.) He had one postural limitation, i.e, his ability to stoop was limited due to his two impairments. (Id. at 203.) He had no manipulative, visual, communicative, or environmental limitations. (Id. at 204-05.) The consultant performing the assessment concluded that the medical

examination report did not support the severity of Plaintiff's alleged symptoms and considered Plaintiff's statements to be only partially credible.  (Id. at 206.)

In January 2006, Dr. Geekie completed a Physician's Assessment for Social Security Disability Claim on Plaintiff's behalf.  (Id. at 214.)  His diagnosis was chronic neck and back pain.  (Id.)  This pain affected his endurance; he would have to rest for seven hours in an eight-hour work day.  (Id.)  He could not handle stress at all, and would not be reliable.  (Id.)  His chronic pain and anxiety and depression prevented him from sustained employment.  (Id.)

Dr. Myers completed the same form in February 2007.  (Id. at 223.)  His diagnosis of Plaintiff was low back and neck pain and headaches.  (Id.)  Prolonged sitting, standing, walking, and lifting objects in excess of five pounds caused the pain, relieved only by lying down.  (Id.)  It was unknown how long Plaintiff would have to rest during an eight-hour work day, but the minimum was a few hours.  (Id.)  The pain prevented Plaintiff from sustained employment.  (Id.)

## The ALJ's Decision

Following the five-step process that the Social Security Administration uses for determining whether an individual is disabled, see pages 26 to 30, below, the ALJ first found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2010, and has not engaged in substantial gainful activity since October 20, 2005.  (Id. at 15.)  He next found that Plaintiff's residual impairment from carpal tunnel surgery and his degenerative disc disease of the spine were a severe combination

impairments.  (Id.)  Plaintiff's hypertension, acid reflux, and the residual impairment from left shoulder surgery were not severe impairments.  (Id.)  In addition, the ALJ found that Plaintiff's mental impairment was not severe due to little evidence presented on the issue. (Id. at 15–16.)  Plaintiff had a medically determinable headache impairment.  (Id. at 16.) Despite the severe combination, Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listing-level impairment.  (Id.)

Addressing the question of Plaintiff's residual functional capacity, the ALJ concluded that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently; could occasionally climb stairs and ramps but never ropes, ladders, or scaffolding; could occasionally stoop; could not perform repetitive work with very small objects; must avoid concentrated exposure to the hazards of unprotected heights and vibration; and required a sit/stand option.  (Id.)  In reaching this conclusion, the ALJ first determined whether there was an underlying medically determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms, and, second, determined the extent to which the intensity, persistence, and limiting effects of Plaintiff's symptoms prevented him from performing basic work activities.  (Id. at 16–17.)

To properly evaluate Plaintiff's symptoms, the ALJ assessed his credibility.  (Id. at 17-19.)   He first reviewed Plaintiff's testimony, finding that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible.  (Id. at 17-18.)  Specifically, an examination conducted on October 19,

2005 (the day prior to the alleged onset date) showed that Plaintiff had a good range of motion in his neck. (Id. at 18.) His extremities were normal; his hand grip strength was strong; his pin prick was good; and he had a good range of motion. (Id.) Next, the November 3, 2005, evaluation by Dr. Shitut reported that a neurological examination of Plaintiff's upper extremities was normal, as was the sensory, motor and reflex examination. (Id.) Neurological examination of the lower extremities was also normal. (Id.) These findings were consistent with the prior examination of Dr. Young, who had found that Plaintiff's strength was 5/5 with normal tone. (Id.) Dr. Young had found no disc herniations. (Id.)

Additionally, the ALJ noted that an MRI of Plaintiff's spine had showed moderate degenerative disc desiccation with a prominent annulus at L3-L4 and an annular tear at L4-L5, but no focal disc protrusion, canal stenosis, or significant facet arthropathy. (Id.) Nothing revealed in the MRI of his lumbar spine required surgical management. (Id.) A cervical MRI showed very minimal damage, but "[could not] explain [Plaintiff's] symptoms." (Id.) An EMG of Plaintiff showed no evidence of left cervical radiculopathy with no denervation in the left upper extremity muscles. (Id.) The left ulnar and superficial radial nerve conduction studies were normal. (Id.) An x-ray of the lumbar spine showed small anterior spurs without destructive bone disease or recent fracture. (Id.) An x-ray of the cervical spine showed mild degenerative changes and normal soft tissues. (Id.) Finally, the ALJ noted that the CT scan of Plaintiff's brain, pelvis, and abdomen was "essentially unremarkable." (Id.) In summary, the ALJ found that

Plaintiff's extreme allegations were not supported by x-rays, MRIs, or the CT scan.  (Id. at 19.)

The ALJ gave little weight to the January 2006 statement of Dr. Geekie or to the February 2007 statement of Dr. Myers, both of which relied on "subjective pain."  (Id.) The ALJ noted that, while a treating physician's opinion is entitled to substantial weight, it must be supported by objective findings and that the weight is less if the opinion only consists of conclusory statements.  (Id. at 19.)  Finding that the statements of Drs. Geekie and Myers were conclusory statements based on Plaintiff's reports of subjective pain and not supported by objective findings, the ALJ gave them little weight.  (Id.)

Also, the ALJ found that Plaintiff's tendency to "give way" during muscle testing detracted from his credibility.  (Id.)  Plaintiff's testimony about his inability to afford medication was hurt by the fact that he recently received $72,000 and still purchased cigarettes.  (Id.)  The ALJ also considered the report that Plaintiff's symptoms were not focused and that Plaintiff had good hand grip strength despite his allegations of difficulty using his hands.  (Id.)

The ALJ gave no weight to the PRFCA because it was prepared by a non-examining lay individual.  (Id.)

Finally, the ALJ cited the fact that Plaintiff reported on March 21, 2005, to his physical therapist that he felt great and did not return for the injections that had helped him.  (Id.)  Consequently, the ALJ concluded, Plaintiff did not find his symptoms distressing enough to return to therapy.  (Id.)

Next, the ALJ found that Plaintiff was unable to perform his past relevant work. (Id. at 20.) Transferability of job skills was not material to determining whether Plaintiff was disabled. (Id.) The Medical-Vocational Guidelines indicated that the Plaintiff was "not disabled" whether or not he possessed transferable job skills. (Id.) Further, based on Plaintiff's age, education, work experience, and residual functional capacity, the ALJ concluded that there are a significant number of jobs in the national economy that Plaintiff can perform. (Id.)

Additionally, although Plaintiff was not able to perform the full range of light work[10] due to certain impairments, the ALJ found that, based on the VE's testimony, Plaintiff would be able to work as a furniture rental consultant, of which 500 jobs existed in Missouri and 20,000 in the national economy, or as a gate or watch guard, of which 10,000 jobs existed in Missouri and 900,000 in the national economy. (Id. at 21.) The ALJ gave no weight to the VE's statement that Plaintiff was not able to work if his allegations were fully credible – the ALJ did not find the allegations fully credible. (Id.)

For the foregoing reasons, the ALJ concluded that Plaintiff was not under a disability from October 20, 2005, through the date of his decision. (Id.)

## Legal Standards

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically

---

[10]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

As noted above, the Commissioner has established a five-step process for determining whether a person is disabled. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920. "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." <u>See</u> 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must have a severe impairment. <u>See</u> 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities . . . ." <u>Id.</u> "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on h[is] ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-

month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)). Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence. **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000). Some medical evidence must be included in the record to support an ALJ's RFC holding. **Id.** at 867. "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th

Cir. 2001) (quoting <u>Frankl v. Shalala</u>, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Ramirez v. Barnhart**, 292 F.3d 576, 580-81 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)). Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." **Id.** <u>See</u> <u>also</u> **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding claimant's disability is inconsistent."). After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

The burden at step four remains with the claimant. **Steed v. Astrue**, 524 F.3d 872, 876 (8th Cir. 2008); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, as in the instant case, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f). The Commissioner may meet his burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, or "[i]f [a claimant's] impairments are exertional (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment," **Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001). "However, when a claimant is limited by a nonexertional impairment, such as pain or mental incapacity, the Commissioner may not rely on the Guidelines and must instead present testimony from a vocational expert to support a determination of no disability." **Id.**; accord **Baker v. Barnhart**, 457 F.3d 882, 894-95 (8th Cir. 2006). See also **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (noting that the Guidelines may be employed if the nonexertional impairment does not diminish or significantly limit the claimant's RFC); Social Security Ruling 83-47C, 1983 W.L. 31276, *3 (S.S.A. 1983) ("[I]f the nonexertional limitation restricts a claimant's performance of a full range of work at the

appropriate [RFC] level, nonexertional limitations must be taken into account and a nonguideline determination made.").

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.'" **Wiese**, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Id.**; **Finch**, 547 F.3d 935; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999). The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000). See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ's adverse decision is not supported by substantial evidence on the record as a whole. Specifically, the ALJ erred (1) in not giving the opinions of Drs. Myers and Geekie the proper weight by (a) disregarding their objective findings, (b) concluding that their opinions were based only on Plaintiff's subjective complaints of pain, and (c) disregarding the treating relationship each doctor had with Plaintiff, and (2) in assessing Plaintiff's RFC, making his own medical judgments, and selectively discussing the medical evidence.

Plaintiff's Treating Physicians. Plaintiff first takes issue with the ALJ's failure to defer to the 2006 statement of Dr. Geekie and to the 2007 statement of Dr. Myers.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" **Tilley v. Astrue**, 580 F.3d 675, 680 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); accord **Davidson v. Astrue**, 578 F.3d 838, 842 (8th Cir. 2009); **Holmstrom v. Massanari**, 270 F.3d 715, 720 (8th Cir. 2001). See also **Wilson v. Apfel**, 172 F.3d 539, 542 (8th Cir. 1999) (noting that a treating physician's opinion does not automatically control the outcome because the record must be evaluated as a whole). Accordingly, "[t]he weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements." **Chamberlain v. Shalala**, 47 F.3d 1489, 1494 (8th Cir. 1995). See also **Piepgras v. Chater**, 76 F.3d 233, 235 (8th Cir. 1996) ("A treating physician's opinion deserves no greater respect than any other physician's opinion

when the treating physician's opinion consists of nothing more than vague, conclusory statements.").

Dr. Geekie wrote in January 2006 that Plaintiff's chronic neck and back pain affected his endurance, causing him to rest for seven hours in an eight-hour work day, and that Plaintiff was not reliable and could not handle stress. At that time, Dr. Geekie presumably had before him Dr. Myers' letter of August 2004, see note 4, supra, and the reports of the September 2004 MRI. The only records of Dr. Geekie that predate his statement are his handwritten notes from a December 30, 2004, visit, see pages 10 to 11, supra, in which Plaintiff reported he had seen Dr. Kumar "a year or so ago," Record at 183, for his back and now saw Dr. Myers. He reported to Dr. Geekie that his back was worse since the accident four months earlier. He requested to see Dr. Young. Other than Plaintiff's blood pressure, weight, and pulse rate, there is no indication that Dr. Geekie examined Plaintiff or otherwise independently assessed Plaintiff's back pain. He might have reviewed the letter from Dr. Myers, who had examined Plaintiff four months earlier and found him to have good strength, normal muscle tone, no weakness, and no atrophy in all four extremities. The pain that Dr. Myers was able to ascertain was over his left scapula. Thus, neither the letter of Dr. Myers or Dr. Geekie's own notes support Dr. Geekie's extreme conclusion that Plaintiff would need to rest for seven of an eight-hour work day. See **Clevenger v. SSA**, 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment notes). This inconsistency between Dr. Geekie's conclusions and his treatment

notes is reflected in Dr. Geekie's reference to Plaintiff's anxiety and depression[11] – neither of which had been referred to in any prior medical records.

When Dr. Myers answered a similar questionnaire about Plaintiff's ability to work, he had more of a longitudinal picture of Plaintiff's impairments, having examined him five times before completing the questionnaire. As noted by the Commissioner, the questionnaire was completed the same day Dr. Myers examined Plaintiff. It is clear from the letter summarizing that visit, however, that the report of Plaintiff's symptoms is taken from Plaintiff's own description, e.g., "[Plaintiff] *states* . . . ." When Dr. Myers had last seen Plaintiff, almost nine months earlier, muscle testing was limited due to Plaintiff's report of pain and "giving way." <u>See</u> **<u>Davidson</u>**, 578 F.3d at 844 (ALJ properly discounted opinion of treating physician about impairment when record showed claimant was malingering during underlying examination). And, as noted by the ALJ, Plaintiff had stopped having trigger point injections, although they had helped, due to cost, but there is no evidence in the record that he was ever denied any medical care, including trigger point injections, due to an inability to pay and there was evidence that he had received $72,000 the month before his visit to Dr. Myers.

The opinions of Drs. Myers and Geekie are also not supported by any tests or clinical data. X-rays and MRIs of Plaintiff's lumbar and cervical spines revealed minimal

---

[11]Dr. Geekie did refer in his treatment notes to Plaintiff's anxiety and depression when next seeing him – almost one year after completing the questionnaire. He prescribed medication and referred both Plaintiff and his wife to a clinic. There is no indication in the record that they followed up on the referral.

degenerative disc disease.  Plaintiff complained in August 2004 of pain for the past twenty-five years; however, he had no weakness, good strength, and normal muscle tone. Five months later, when consulting Dr. Young about neck pain, on examination, Plaintiff had normal muscle strength and described the pain as being spontaneous.  When seeing the physical therapist the following day, he described his pain as existing for years, and had a normal range of movement in his upper and lower extremities.  The day before Plaintiff's alleged disability onset date, he had a good range of motion, but pain, in his neck.  He said he was too young to retire.

For the foregoing reasons, the ALJ's conclusion that Drs. Myers and Geekie's statements are based on Plaintiff's subjective complaints[12] and are not independently supported by their treatment notes or other data or tests in the record is supported by substantial evidence on the record as a whole.  See **Kirby v. Astrue**, 500 F.3d 705, 709 (8th Cir. 2007) (finding that ALJ was entitled to discount treating physician's statement as to claimant's limitations because such conclusion was based primarily on claimant's subjective complaints and not on objective medical evidence); accord **Vandenboom v. Barnhart**, 421 F.3d 745, 749 (8th Cir. 2005); **Brown v. Chater**, 87 F.3d 963, 964 (8th Cir. 1996).

Plaintiff also argues that the ALJ erred by not complying with 20 C.F.R. § 404.1527(d) because he discussed only two of the six factors the regulation requires be

---

[12]Plaintiff does not take issue with the ALJ's assessment of his credibility.

evaluated when weighing opinions of treating physicians. The six factors are: (1) the examining relationship; (2) treatment relationship, including the length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors, e.g., "the extent to which an acceptable medical source is familiar with the other information in [the claimant's] case record." 20 C.F.R. § 404.1527(d)(1)-(6).

Plaintiff correctly notes that the ALJ did not explicitly discuss each of the six factors when explaining his assessment of the weight to be given the statements of Drs. Myers and Geekie. It is clear from that explanation and his decision, however, that the ALJ properly considered each factor. "'[A]n arguable deficiency in opinion-writing technique'" does not require the ALJ's decision to be set aside if that deficiency "'had no bearing on the outcome.'" **Owen**, 551 F.3d at 801 (quoting Hepp v Astrue, 511 F.3d 798, 806 (8th Cir. 2008)). The regulations require that an ALJ "'always give good reasons'" for the weight given a treating source's opinion. **Reed v. Barnhart**, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)). The ALJ did so.

Plaintiff's RFC. Plaintiff next argues that the ALJ's assessment of his RFC is not supported by the medical evidence and is drawn instead from the ALJ's inappropriate medical judgments.

As noted above, the ALJ found that Plaintiff has the RFC to

lift and carry 20 pounds occasionally and 10 pounds frequently, to occasionally climb stairs and ramps but never ropes, ladders or scaffolding,

to occasionally stoop, regarding fine fingering and find [sic] manipulations he cannot not perform repetitive work with very small objects, must avoid concentrated exposure to the hazards of unprotected heights and vibration, and requires a sit/stand option.

(R. at 16.)  The lifting restrictions are consistent with the non-examining consultant's PRFCA.  The requirement of a sit/stand option and the manipulative and environmental limitations are inconsistent.  The ALJ explained his rejection of the PRFCA by noting that it was completed by a lay person.  The ALJ did not, however, explain how he drew his conclusions as to Plaintiff's more-restrictive RFC.  His assessment of Plaintiff's RFC is not supported by that of a consulting examiner or by his treating physicians.  Nor is it supported by other medical evidence.  There must be "[s]ome medical evidence" to "support the determination of a claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." **Eichelberger v. Barnhart**, 390 F.3d 584, 591 (8th Cir. 2004) (internal quotations omitted).  When, as in the instant case, the burden has shifted at step five to the Commissioner, the Commissioner "must then prove . . . that the claimant retains the RFC to do other kinds of work." **Id.**

"An [ALJ] may not draw upon his own inferences from medical reports." **Nevland v. Apfel**, 204 F.3d 853, 858 (8th Cir. 2000) (internal quotations omitted) (addressing ALJ's RFC assessment at step five).  In that case, the Eighth Circuit Court of Appeals reversed and remanded a case in which the ALJ's RFC was not supported by any medical evidence.  **Id.** at 858.  The court noted that the hypothetical posed to the VE at

step five included the ALJ's RFC and was, therefore, not substantial evidence to support the denial of benefits. **Id.**

Without any medical evidence to support the ALJ's RFC, it appears that the ALJ may have simply drawn his own inferences. Having rejected, properly, Plaintiff's treating physicians' opinions and the PRFCA, the ALJ should have ordered a consultative examination. See **Id.** (reversing and remanding case to Commissioner for such examination).

In support of his argument that the ALJ's RFC is supported by the record, the Commissioner cites **Ellis**, supra. In that case, the claimant argued that the ALJ had improperly rejected his treating physician's opinion without contacting the physician for clarification when assessing his RFC. 392 F.3d at 994. The Eighth Circuit disagreed, finding that the opinion was not supported by any medical evidence and that there was no showing of any prejudice from the failure to re-contact the physician. **Id.** at 995. In that case, however, the RFC was supported by the medical evidence of an examining consultant. **Id.** at 992, 995. And, in **Pearsall v. Massanari**, 274 F.3d 1211, 1218 (8th Cir. 2001), also cited by the Commissioner, the ALJ's RFC was supported, in part, by the observations of a consultative physician. See also **Tucker v. Barnhart**, 363 F.3d 781, 783-84 (8th Cir. 2004) (affirming ALJ's step five assessment of claimant's RFC that was more restrictive than those found by claimant's own treating physician but was consistent with that of a medical expert).

## Conclusion

The ALJ's decision to discount the opinions of Drs. Myers and Geekie in their respective letters is supported by substantial evidence on the record as a whole. The support for the ALJ's RFC is lacking, however, and the case should be reversed and remanded to develop the medical evidence on that issue. Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be REVERSED and that this case be REMANDED for further proceedings as set forth above.

The parties are advised that they have **up to and including December 28, 2009**, in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact. See **Griffini v. Mitchell**, 31 F.3d 690, 692 (8th Cir. 1994).

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  17th  day of December, 2009.